# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

Nos. 04-1038/2223

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Olusoji Michael Agboola, | * | CR 01-162 JRT/FLN |
| | * | |
| Appellant. | * | |

Submitted: February 14, 2005
Filed: August 8, 2005

Before LOKEN, Chief Judge, RILEY and SMITH, Circuit Judges.

RILEY, Circuit Judge.

Olusoji Michael Agboola (Agboola) was indicted on forty-three counts involving a real estate "flipping" scheme. Agboola eventually pled guilty to three counts, including bankruptcy fraud, perjury, and fraudulent concealment. Agboola pled *nolo contendere* to the remaining counts. The district court[1] sentenced Agboola to 108 months' imprisonment and five years' supervised release, and ordered mandatory restitution of $582,679.45. We affirm.

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

SCANNED
SEP 26 2005
U.S. DISTRICT COURT ST. PAUL

## I. BACKGROUND

Agboola, a Nigerian citizen, owned a mortgage brokerage company called Mortgage Advancement Corporation (MAC), and two other companies called AG Properties (AG) and AGM Investment Corporation (AGM). MAC provided mortgage brokering and other real estate services. From 1997 to 2001, Agboola and his brother-in-law, Michael Aihe (Aihe), were involved in a property "flipping" scheme where certain property values were inflated through fraudulent appraisals provided by Aihe's company, Lakeland Appraisals. Agboola purchased properties through AG and AGM, then resold them to MAC clients, in order to inflate the apparent value of the properties and generate fraudulently obtained proceeds. The transactions MAC brokered used false seller carry-back promissory notes, fraudulent down payments, and other false documents and devices. These practices permitted MAC, AG, and AGM to obtain loan proceeds exceeding the actual market value of the real estate.

AG and AGM would hold title to real estate for as little as one day before selling to a MAC client for substantially higher prices, based on the fraudulent appraisals. Agboola encouraged MAC employees to set up their own companies to purchase and sell real estate, as well as use "seller carry-back" loans to pay off a client's down payment to help the client qualify for a mortgage. Agboola provided the funds for these transactions. The normal practice at MAC was to forgive the carry-back loans so clients would not have to repay them, but institutional lenders were not informed of the practice. Agboola also directed MAC employees to submit fraudulent loan documents, deposit verifications, employment records, income records, and tax returns to mislead lenders into funding transactions MAC brokered.

In 1998, Agboola filed for bankruptcy. He concealed assets, income, property, and ownership in his businesses from the bankruptcy court by using an alias and a second social security number, and by attributing ownership of assets to a nonexistent brother. Agboola claimed assets of $4885 and liabilities totaling $236,948. The bankruptcy court discharged Agboola's debts.

On January 19, 2000, Agboola was charged with bankruptcy fraud, mail fraud, and money laundering, and an arrest warrant issued. Agboola left Minnesota and went to Texas after the arrest warrant issued. Agboola claimed he did not know about the arrest warrant but, after leaving Minnesota, he obtained a driver's license in Texas under the name Michael Aina. Agboola used the Texas license to obtain a Minnesota identification card using the name Michael Aina. Agboola then used the Minnesota identification card and an employee's, Kola Aina's, social security number to obtain a Florida driver's license under the name Michael Aina. Agboola used the Florida license to open a bank account to deposit a check he obtained in Minnesota. Agboola also possessed two Minnesota driver's licenses, one in his own name and the other in the name of Michael Olusoji Agboola.

In February 2001, Agboola returned to Minnesota. Agboola spoke to a former client, who informed Agboola that law enforcement had questioned a lot of people who purchased homes from Agboola. Agboola replied that he was under investigation and "was just keeping low . . . staying low."

On March 14, 2001, Aihe told federal agents in Florida he saw Agboola in February or March 2001. On March 20, federal agents surveilled a title insurance company's office in Lake Mary, Florida. Aihe and Agboola arrived at the business. Aihe entered the business and asked for "Michael." Agboola entered the business minutes later and stated he had an appointment. After agents confirmed Agboola was the person wanted under their arrest warrant, they arrested him. Upon arrest, Agboola told IRS Special Agent Kathy Klug (Agent Klug) he was tired of running and being a fugitive.

On January 15, 2002, the government filed a forty-four count superceding indictment against Agboola and Aihe. Agboola was charged in forty-three counts as follows: conspiracy to commit mail fraud (Count 1); mail fraud (Counts 2 through 3 and 12 through 21); wire fraud (Counts 4 through 7); money laundering with intent

to promote aiding and abetting (Counts 8 and 9); transactions in criminally derived property (Counts 10 and 26 through 40); bankruptcy fraud (Count 11); money laundering with intent to conceal aiding and abetting (Counts 22 through 25); perjury (Count 41); using a fraudulently procured social security number (Count 42); and fraudulent concealment (Count 43).

On May 1, 2002, Agboola pled guilty to four counts in the superceding indictment. The district court later granted Agboola's motion to withdraw the guilty plea. On January 22, 2003, Agboola pled guilty to Count 11, bankruptcy fraud in violation of 18 U.S.C. § 152(1); Count 41, perjury in violation of 18 U.S.C. § 1621; and Count 43, fraudulent concealment in violation of 18 U.S.C. § 1001(a)(1). Agboola pled *nolo contendere* to Counts 1 through 10, 12 through 40, and 42. At his change-of-plea hearing, Agboola admitted he concealed assets in his bankruptcy petition, failed to provide accurate information, failed to disclose his interest in his companies, lied to the bankruptcy court, and defrauded the Social Security Administration. Before the plea was entered, the court and the government expressed reservations about letting jurors leave the courthouse, due to Agboola's prior withdrawal of his guilty plea. The government opposed permitting Agboola to plead *nolo contendere* to any counts, stating it was prepared to go to trial and prove all the charges in the indictment. The government opined "it [was] not in the public interest of the effective administration of justice to allow the defendant to plead nolo contendere, thereby necessitating a contested evidentiary hearing down the line with respect to all of these matters that are before the Court and could be resolved by a jury at this point." The district court accepted Agboola's pleas.

The district court held sentencing evidentiary hearings (evidentiary hearings) in July and August 2003. On December 13, 2003, Agboola again moved to withdraw his guilty plea. The district court denied his motion, noting the government's position at the change-of-plea hearing eleven months earlier that the government had been prepared to go to trial against Agboola at that time. The district court found the loss

to others from Agboola's property flipping scheme and bankruptcy fraud totaled $738,498, requiring a ten-level enhancement. The court also assessed a two-level obstruction of justice enhancement. The court grouped the money laundering counts together and assessed a base offense level of 23 for those offenses. The court sentenced Agboola to 60 months on Counts 1, 11, and 41 through 43, and 108 months on Counts 2 through 10 and 12 through 40, with the sentences to run concurrently. Finding "no reason to sentence [Agboola] to anything more than the bottom of the applicable guideline range," the court stated "the sentence at the bottom of the applicable guideline range is sufficient to . . . adequately cover any issues." Finally, the district court ordered Agboola to pay mandatory restitution of $582,679.45, including $563,785 to victims of the real estate scheme and $18,894.45 to creditors related to the bankruptcy fraud.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

Agboola argues he should be permitted to withdraw his pleas due to ineffective assistance from his retained counsel. Agboola contends counsel should have sought to sever the bankruptcy charges from the remaining counts. He also contends counsel should have objected to Agent Klug's testimony at the evidentiary hearing, because she was not qualified as an expert.

"Generally, ineffective assistance of counsel claims are better left for post-conviction proceedings." United States v. Cook, 356 F.3d 913, 919 (8th Cir. 2004). We do so because facts from outside the original record usually must be developed to decide such a claim. United States v. Murphy, 899 F.2d 714, 716 (8th Cir. 1990). Similarly, a claim that a guilty plea was involuntary is an "issue[] that first must be presented to the district court and [is] not cognizable on direct appeal." Id. However, ineffective assistance "claims are proper on direct appeal in exceptional cases where the record has been fully developed or to avoid a plain miscarriage of justice." Cook, 356 F.3d at 919-20. Such claims "may also be appropriate on direct

appeal when trial counsel's ineffectiveness is readily apparent or obviously deficient." Id. at 920.

This direct appeal is not exceptional, and counsel's alleged ineffectiveness is not readily apparent in the current record. Although Agboola claims an adequate record is established on several ineffective assistance issues, Agboola admits he did not present all ineffective assistance arguments in this appeal. Thus, Agboola specifically reserves the right to reassert ineffective assistance claims in a post-conviction proceeding.

We conclude Agboola has not shown he raised his ineffective assistance claim in the district court, the record is not fully developed as to these claims, "and justice does not beckon us to consider his claim on direct review." United States v. Woods, 270 F.3d 728, 730 (8th Cir. 2001). We conclude the better result is to reject Agboola's claim without prejudice to his right to raise it in a post-conviction proceeding. Id.

**B. Expert Witness**

Agboola argues the district court abused its discretion by permitting Agent Klug to testify at the evidentiary hearing as a lay witness on issues properly the subject of expert testimony. Although Agboola did not object to Agent Klug's testimony as exceeding the scope of lay witness testimony (also part of his ineffective assistance claim above), he asserts the district court *sua sponte* should have excluded Agent Klug's testimony. Normally, we review a district court's evidentiary decision for abuse of discretion, United States v. Walker, 393 F.3d 842, 848 (8th Cir. 2005); however, because Agboola did not object to Agent Klug's alleged expert testimony, we review the decision (or lack thereof) for plain error, Roe v. Delo, 160 F.3d 416, 418 (8th Cir. 1998).

We have held "the sentencing process does not carry the same evidentiary protections guaranteed during a criminal trial." Smith v. United States, 206 F.3d 812, 813 (8th Cir. 2000) (per curiam); see Fed. R. Evid. 1101(d)(3). When resolving a disputed sentencing factor, the court may consider relevant information without regard to its admissibility under evidentiary rules, U.S.S.G. § 6A1.3(a), and hearsay testimony is admissible, so long as sufficient indicia of reliability exist, United States v. Campos, 87 F.3d 261, 264 (8th Cir. 1996).

We conclude Agent Klug did not testify to matters reserved for expert testimony. Agent Klug had personal knowledge of the content of her testimony. Agent Klug testified about her investigation of Agboola, her review of documents regarding his real estate transactions, and the sources of her knowledge. Agent Klug noted her testimony about normal lending practices came from discussions with lenders and their explanations of how appraisals affected lending decisions. This testimony demonstrated the basis for Agent Klug's knowledge about such matters. However, to the extent this testimony may have contained hearsay information, the whole of Agent Klug's testimony provides sufficient indicia of reliability to permit the district court to consider her testimony. Campos, 87 F.3d at 264. Her testimony was not "expert" in nature. Thus, the district court committed no error, let alone plain error, in admitting her testimony.

**C. Grouping of Counts**

Agboola argues the district court erred by grouping the money laundering counts under 18 U.S.C. § 1956(a)(1)(A) with those under section 1956(a)(1)(B). We review de novo the district court's application of the United States Sentencing Guidelines (Guidelines). United States v. O'Kane, 155 F.3d 969, 971 (8th Cir. 1998).

The district court grouped the "promotion" money laundering counts (Counts 8 and 9) with the "concealment" money laundering counts (Counts 22 through 25). The base offense level for promotion laundering is 23, while the base offense level

for concealment laundering is 20. See U.S.S.G. § 2S1.1 (2000).[2] Thus, the district court began its sentencing calculation at a base offense level of 23. After adding different enhancements, the district court assessed Agboola's total offense level at 31. Arguing the district court erroneously grouped the counts to start with an offense level of 23, as opposed to 20, Agboola contends the total offense level should be 28.

"Under section 3D1.2 of the Guidelines, all counts involving 'substantially the same harm' should be grouped together for purposes of determining the offense level for the crimes." United States v. Green, 225 F.3d 955, 958 (8th Cir. 2000). Grouping is appropriate "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss." U.S.S.G. § 3D1.2(d). We have acknowledged "several separate money laundering counts could properly be grouped together under [section 3D1.2(d)]." O'Kane, 155 F.3d at 974. Indeed, the Guidelines provide that money laundering counts covered by sections 2S1.1, 2S1.2, and 2S1.3, which include those counts at issue here, are to be grouped. U.S.S.G. §§ 2S1.1 (enforcing 18 U.S.C. § 1956); 3D1.2(d). When offenses are grouped pursuant to section 3D1.2(d), and "[w]hen the counts involve offenses of the same general type to which different guidelines apply," the district court is to apply the Guideline "that produces the highest offense level." U.S.S.G. § 3D1.3(b). The higher offense level of 23 comes from the section 1956(a)(1)(A) offenses (the "promotion" counts). U.S.S.G. § 2S1.1(a)(1). Because the district court properly grouped the counts and correctly set the base offense level at 23, the district court did not err in assessing Agboola's offense level for money laundering. See, e.g., O'Kane, 155 F.3d at 974.

### D. Other Sentencing Issues

#### 1. Blakely/Booker

Citing Blakely v. Washington, 124 S. Ct. 2531 (2004) (declaring Washington's sentencing system unconstitutional), Agboola argues the district court erred in

---

[2]The district court applied the 2000 edition of the Guidelines, as do we.

increasing his base offense level based on evidence that was not charged in the indictment, found by a jury, nor admitted by him. Agboola also claims the district court erred by assessing a two-level enhancement for obstruction of justice and a ten-level enhancement for the amount of loss caused by his fraud.

During the pendency of this appeal, the Supreme Court decided United States v. Booker, 125 S. Ct. 738, 749-57 (2005), which applied the holding of Blakely to the Guidelines. The Booker Court rendered the Guidelines "effectively advisory" by excising two provisions of the Sentencing Reform Act of 1984. Id. at 756-57. Under the advisory Guidelines system, the district court must "consider Guidelines ranges," but it is permitted "to tailor the sentence in light of other statutory concerns as well." Id. at 757 (citing 18 U.S.C. § 3553(a)). Courts of appeals now review the ultimate sentence imposed for unreasonableness. Id. at 765.

Agboola did not assert a Sixth Amendment objection at his sentencing hearing. Thus, we review his sentence for plain error, United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc), a demanding standard not easily met, United States v. Rodriguez-Ceballos, 407 F.3d 937, 940 (8th Cir. 2005) (citing United States v. Dominguez Benitez, 542 U.S. 74, __, 124 S. Ct. 2333, 2340 (2004)). Under Federal Rule of Criminal Procedure 52(b), "a court of appeals [has] a limited power to correct errors that were forfeited because not timely raised in district court." United States v. Olano, 507 U.S. 725, 731 (1993). To show plain error, Agboola must demonstrate "(1) error, (2) that is plain, and (3) that affect[s] substantial rights." Johnson v. United States, 520 U.S. 461, 467 (1997) (internal quotations omitted) (alteration in original). If the defendant meets these three conditions, our court has discretion to remand for resentencing "if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotations omitted) (alteration in original). We must exercise plain-error review "sparingly." Jones v. United States, 527 U.S. 373, 389 (1999).

We can assume the district court committed Booker error when it applied "the Guidelines as mandatory, and the error is plain, that is, clear or obvious, at this time." Pirani, 406 F.3d at 550. Thus, we must determine whether the error affected Agboola's substantial rights. To establish such an effect, Agboola must show a "reasonable probability that he would have received a more favorable sentence with the Booker error eliminated by making the Guidelines advisory." Id. at 551.

The record does not indicate the district court would have given Agboola a more lenient sentence absent a Booker error. While the district court "f[ound] no reason to sentence [Agboola] to anything more than the bottom of the applicable guideline range," it stated "the sentence at the bottom of the applicable guideline range is sufficient to . . . adequately cover any issues." This bottom of the Guidelines range pronouncement "is insufficient, without more, to demonstrate a reasonable probability that the court would have imposed a lesser sentence absent the Booker error." Id. at 553. "Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights." Jones, 527 U.S. at 394-95. Agboola has not shown a reasonable probability the district court would have imposed a more lenient sentence under an advisory Guidelines system. Therefore, we find no plain error in Agboola's sentence.

Regardless, after Booker we still must consider the enhancements the district court assessed by reviewing its factual findings for clear error and its interpretation and application of the Guidelines de novo. United States v. Mathijssen, 406 F.3d 496, 498 (8th Cir. 2005); United States v. Mashek, 406 F.3d 1012, 1016 (8th Cir. 2005). The unreasonableness standard announced in Booker applies only to the ultimate sentence the district court imposes. Mathijssen, 406 F.3d at 498. The correct Guidelines range "remains the critical starting point for the imposition of a [defendant's] sentence." Mashek, 406 F.3d at 1016 n.4. We address below the propriety of the enhancements applied to Agboola.

**2. Obstruction of Justice**

Agboola claims the district court erred in increasing his offense level for obstructing justice. Section 3C1.1(A) provides a two-level enhancement if "the defendant willfully obstructed or impeded . . . justice during the course of the investigation, prosecution, or sentencing of the instant offense." "Willful" means the "misconduct occurs with knowledge of an investigation, or at least with a correct belief that an investigation is probably underway." United States v. Oppedahl, 998 F.2d 584, 586 (8th Cir. 1993). The district court has "broad discretion to apply section 3C1.1 to a wide range of conduct." United States v. Duke, 935 F.2d 161, 162 (8th Cir. 1991).

In United States v. Smith, 62 F.3d 1073, 1079 (8th Cir. 1995), we concluded the district court did not err in applying the enhancement to a defendant who answered Secret Service questions in a post-arrest interview and offered to cooperate with agents, but subsequently gave a false address, sold fraud proceeds, and then fled. The defendant in Smith adopted aliases and was not located until a police investigation discovered her three years later. We observed these facts contradicted the defendant's assertion she "merely 'was not in the state when agents began looking for her.'" Id. Instead, we held the facts indicated the defendant actively hindered her arrest and the resolution of her case sufficiently to constitute obstruction. Id.

Similarly, the enhancement was proper in this case. In 1999, Agboola knew his business was under investigation. With knowledge of the investigation, Agboola closed the Minneapolis business and went to Texas. The government adduced evidence Agboola knew an arrest warrant had issued for him, and the district court found incredible Agboola's unsupported assertion that he did not know he was under investigation. Agboola possessed two Minnesota driver's licenses. He obtained a fraudulent Texas driver's license, then used that license to get a false Minnesota identification card. Agboola again left Minnesota, went to Florida, and obtained another false driver's license using another person's social security number. Agboola

used that license to open a bank account to deposit checks he received in Minnesota. When Agboola returned to Minnesota in 2001, he told one of his former clients he was under investigation but "was just keeping low." Agboola knew before he again left Minnesota that he was under investigation. Finally, upon his arrest, Agboola stated he was tired of running and being a fugitive. These facts show Agboola actively impeded arrest and resolution of his case. Agboola's conduct was sufficient to establish obstruction of justice, and the district court did not err in applying the enhancement.

**3. Amount of Loss**

Agboola contends the district court erred in finding the amount of loss was between $500,000 and $800,000, and thereby erred in increasing his base offense level on the fraud counts. Specifically, Agboola claims there were no victims and no loss associated with the property flipping schemes. The district court found the loss from property flipping amounted to $563,785, and the loss from the bankruptcy fraud was $174,713, for a total loss of $738,498. Agboola challenges only the calculation of the amount of loss, not the amount of restitution the district court ordered.

Guidelines section 2F1.1(a) provides a base offense level of 6 for fraud offenses. Section 2F1.1(b)(1)(K) mandates a ten-level enhancement if the loss is over $500,000 but less than $800,000. Application note 9 instructs "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 cmt. n.9. This estimate "may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." Id. "The amount of fraud loss for sentencing purposes is the greater of the loss defendants intended to inflict at the time of the fraud, or the actual loss." United States v. Coon, 187 F.3d 888, 899 (8th Cir. 1999).

We conclude the district court's finding that there were victims and losses from Agboola's crimes was not clearly erroneous. A victim is the object or target of the defendant's crime. United States v. Manfre, 368 F.3d 832, 845 (8th Cir. 2004). As the district court found, Agboola purchased properties at low prices, held title to the properties a short period of time, then resold the properties at prices that materially overstated the true market value, often selling the properties the same day he purchased them. Agent Klug testified to specific instances of such "flipping." The prices and sales were based on Aihe's fraudulent appraisals. Agboola's victims were those who purchased the properties at the fraudulently inflated prices, and the lenders who made loans for the fraudulently inflated home values. According to Agent Klug, these lenders lost money because they lent more money than a particular property was worth, due to the fraudulent appraisals. The court also found Agboola was involved in all of the properties listed in the PSR, concluding Agboola's claims that he was not involved in the transactions were incredible–a credibility determination that is virtually unreviewable on appeal. United States v. Gary, 341 F.3d 829, 835 (8th Cir. 2003). This is not a case where a rising tide lifted all ships–while Agboola's ship was rising, others sank. Thus, the district court did not clearly err in finding Agboola's crimes had victims.

The district court heard testimony from some victims about different losses they incurred. Agent Klug testified she narrowed her initial investigation down from 140 properties to ninety properties involving one of Agboola's companies. From those ninety, Agent Klug narrowed the list further to only those properties where Agboola sold the properties within two weeks of acquiring them. Agent Klug stated she narrowed the list to include only twenty-eight properties to show the profits Agboola made on those sales over a two-week period were unreasonable. The district court noted the "government ha[d] been conservative in its estimates of the victims involved in this case." According to Agent Klug, no basis existed for the substantial increase in the value of these properties in the short time frame. In six cases, properties were sold at substantially increased prices on the same day they were

purchased. Agent Klug testified she prepared a schedule identifying the gross profits Agboola received from the twenty-eight real estate flipping schemes. The schedule listed the properties, the gross profit from each sale, and the amount of the seller carry-back mortgages. The total amount of the seller carry-back mortgages, which investigators believed were fictitious and made only to induce lenders to provide funds for borrowers, was subtracted from total gross profits to arrive at a gain figure of $563,785. The court eventually considered only Agboola's pecuniary gain from those twenty-eight transactions, rather than the ninety transactions originally identified as part of the scheme. The district court overruled Agboola's objection and relied on this calculation as the amount of loss to the victims. The district court's findings were not clearly erroneous.

Nor did the district court clearly err in concluding Agboola gained money from his criminal activity, an alternative method of calculating loss if the actual loss to victims reasonably cannot be determined. U.S.S.G. § 2F1.1, cmt. n.9. Additionally, the district court found Agboola concealed ownership of assets from the bankruptcy court, but found the PSR overstated the amount attributable to Agboola's concealment and reduced the amount from $236,948 to $174,713, reducing the total loss to $738,498.

As recognized by the Guidelines, the damage wrought by fraud is sometimes difficult to calculate, so a district court is charged with the difficult task of making a reasonable estimate of the damages or loss. Because the district court need only make a reasonable estimate of loss rather than a precise determination, United States v. French, 46 F.3d 710, 715 (8th Cir. 1995), we conclude the district court did not err in calculating the amount of loss attributable to Agboola's crimes.

**4. Satisfactions of Mortgages**

Finally, in a separate appeal, Agboola claims the district court erred in ordering him to execute satisfactions on fraudulently obtained second mortgages on four

properties. Agboola also contends the court erred by voiding the mortgages after he failed to execute the satisfactions. Agboola argues the court's order voiding the mortgages is unconstitutional under Blakely, because it is based on judicial findings neither admitted by him nor found by a jury. Because Agboola failed to object on this basis in the district court, we review this claim for plain error. While Agboola cites Blakely and other Sixth Amendment cases, he provides absolutely no authority to support his position on the substantive issue of the satisfactions. The district court noted its finding that the second mortgages were procured by fraud, and expressed its concern that the individual victims continue to have the burden of the fraudulent second mortgages on their property.

Without guidance from the parties on the substantive issue, we can only conclude the issue regarding mortgage satisfactions is most analogous to restitution orders. "[S]ince restitution is essentially '[a] civil remedy included with a criminal judgment,' the facts underlying a restitution order need not be established beyond a reasonable doubt and thus are not governed by Apprendi, Booker and the other recent jurisprudence addressing sentencing issues." United States v. Rand, 403 F.3d 489, 495 n.3 (7th Cir. 2005); see United States v. Vanhorn, 399 F.3d 884, 886-87 (8th Cir. 2005) (concluding defendant's argument, that Booker applied to district court's finding in post-judgment proceeding that increased amount of restitution defendant owed, was meritless); United States v. Swanson, 394 F.3d 520, 526 (7th Cir. 2005) (holding Booker does "not affect the manner in which findings of restitution or forfeiture amounts must be made"). These second mortgages were obtained by fraud, and should be cancelled to restore the fraud victims, as much as possible, to their pre-fraud positions. To the extent Agboola possesses any value in the mortgages, that value may be disgorged. Based on the incomplete record before us, we conclude the district court did not err in voiding Agboola's interest in the fraudulently obtained second mortgages.

## III. CONCLUSION

For the foregoing reasons, we affirm Agboola's conviction and sentence.

---

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans